

# NUMBERS 13-20-00336-CR AND 13-20-00337-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**TALVIN DJUAN GARLEY,**                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

### On appeal from the 122nd District Court
### of Galveston County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Longoria**

In appellate cause number 13-20-00336-CR, appellant Talvin Djuan Garley was convicted of aggravated assault committed with a deadly weapon. *See* TEX. PENAL CODE ANN. § 22.02(a)(2). In appellate cause number 13-20-00337-CR, appellant was convicted of felon in possession of a firearm. *See id.* § 46.04(a). The matters were tried together. In this consolidated appeal, appellant alleges: (1) we lack jurisdiction because the trial court

timely rendered an order on his motion for new trial; (2) the evidence as to the aggravated assault charge was insufficient; and (3) he received ineffective assistance of counsel at the punishment stage of trial as to the felon in possession of a firearm charge. We affirm.

## I. BACKGROUND[1]

As to the aggravated assault charge, the State's indictment alleged that:

> [appellant], on or about the 23rd day of March, 2018 . . . did then and there intentionally and knowingly threaten Sharise[2] Clark with imminent bodily injury by displaying a firearm or shooting a firearm, and did then and there use or exhibit a deadly weapon, namely a firearm, during the commission of the assault.

As to the felon in possession of a firearm charge, the State's indictment alleged that:

> [appellant], on or about the 23rd day of March, 2018 . . . did then and there, having been convicted of the felony offense of Burglary of a Habitation on the [sic] October 28, 2014, . . . intentionally and knowingly possess a firearm before the fifth anniversary of [appellant's] release from confinement following conviction of that felony.

### A. Guilt/Innocence

At trial, the jury heard testimony from Officer Matthew Bonner of the Texas City Police Department (TCPD). Officer Bonner testified that he responded to a "weapons offense" call at an apartment complex, where there was a report of shots being fired into a vehicle. When Officer Bonner arrived at the scene, he testified that he observed "approximately three to four bullet holes or impact points" on a vehicle "from a projectile that had been fired out of a weapon." The rear tire of the vehicle on the driver's side was

---

[1] These cases are before this Court on transfer from the Fourteenth Court of Appeals in Houston pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] We note that the record reflects the spelling as both "Sharise" and "Sherise." There is no dispute as to whom the record is referring. We refer to her as Clark throughout.

2

flat, which he believed was caused by a projectile. Five shell casings were recovered at the scene. Officer Bonner described the owner of the vehicle, Clark, as "visibly distraught," "upset," "nervous," and "real timid." Clark was with two friends, Robert Nash and Tammy King. Per the report, King was the one to call 9-1-1 to report the shots fired.

Officer Bonner's role in the investigation was described as "preliminary," wherein he documented the scene and interviewed the witnesses to get as much information as possible about what had happened. After his initial investigation, he referred the case to the Criminal Investigation Division (CID) for a detective to take over the case and "more thoroughly" conduct the investigation. Officer Arthur Lee Cunningham of the TCPD testified that his role was to collect evidence, take photographs, and to process the scene regarding the underlying incident. The only evidence he collected were the shell casings found near Clark's car.

Detective Brian Berg of the TCPD testified that he was assigned the case after Officer Bonner did the initial report. As part of his investigation, he interviewed Clark and several witnesses, recovered video evidence that was admitted at trial through the apartment complex's assistant property manager, worked with the District Attorney's office to secure a warrant for appellant, and arrested appellant. Detective Berg described the video surveillance of the incident, explaining that Clark's vehicle was at the entry way to the apartment complex with another vehicle behind hers. The video depicts a man firing a gun at Clark's vehicle. Detective Berg explained that Clark identified appellant as the shooter from the incident. Given that information, Detective Berg was able to compile a photo lineup, which included appellant and five other individuals described as similar in

3

race, build, and physical description. King identified appellant from the photo lineup as the "person who committed the crime."

Sergeant William Kilburn with the forensic services unit of the Galveston County Sheriff's Office testified regarding appellant's fingerprints. He explained that he fingerprinted appellant and compared the fingerprints to those on a judgment for a prior conviction. Based on his training and expertise, Sergeant Kilburn testified that the prints were the same, indicating appellant had previously been convicted of a felony.

The jury also heard testimony from Nash that on the evening of the shooting incident, he, Clark, and King had gone to a bar together and then to Whataburger. After Whataburger, Clark was driving both Nash and King home, stopping to drop King off first. Upon arrival at King's apartment complex, they had difficulty with the gate and were unable to enter. Nash explained that while he and Clark were waiting for King to open the gate, another vehicle pulled up behind them and a man approached the driver's side of Clark's vehicle. Nash stated that Clark and the man were talking to each other, describing their demeanor as calm, when the man walked back to his car, then reapproached Clark's vehicle and began shooting at Clark's vehicle. Nash explained that after the shots were fired the man "walked off, walked back to his car, came back, threw some money on the ground, and walked back and then came back and picked it up." When he picked up the money, the man said, "you get your own car fixed," and then he left. Nash did not see the man point the gun at any person, just toward Clark's vehicle. According to Nash, Clark did not want to call the police, but King called the police.

King also testified, describing the events leading up to the shooting incident

4

similarly to Nash, though King stated that she and Nash were at a bar and Clark picked them up before taking them to Whataburger. When they got to King's apartment, she explained that she had to use the pedestrian entrance to go through the gate. When she got through, she noticed another black Mercedes pulled in behind Clark's car and King "heard a lot of commotion." Clark then called her back to the vehicle. Contrary to Nash's testimony, King stated that the man was angry and confrontational and using foul language as he spoke to Clark. She testified that the man shot Clark's vehicle with a gun, which King stated frightened her. King testified to the same sequence of events, including the man throwing money, but King said the man took the money back saying Clark "wasn't worth it." King was the one to call the police. She also subsequently reported to the police station for an interview regarding the incident. She was shown a photo lineup and she identified appellant as the man who shot Clark's vehicle.

The defense called Keosha Hardy, who has a son with appellant. Hardy testified that on the night the Clark's vehicle was shot, appellant spent that night with her. She explained that, to her knowledge, appellant did not drive a black Mercedes, but rather operated a motorcycle. Hardy explained that she and appellant had been dating for seven years, but she admitted that appellant also had a relationship with Clark at some point during that same time; Hardy explained appellant had multiple relationships during the time she was dating him.

The jury found appellant guilty of aggravated assault with a deadly weapon and of unlawful possession of a firearm by a felon. Appellant elected to have the trial court assess punishment.

5

**B.    Punishment**

Appellant pleaded not true to the enhancement paragraph which alleged he had a prior conviction. Officer Neal Mora, a crime scene investigator with TCPD, testified that he was tasked with processing Clark's vehicle when it was brought in. The vehicle had three bullet holes located in the rear quarter panel of the vehicle on the driver's side. One of the bullet holes penetrated the trunk of the vehicle, damaging some items in the vehicle's trunk and ultimately stopping in the spare tire located in the trunk. No bullets entered the passenger compartment of the vehicle.

The State also presented Deputy Cory Pool of the Harris County Sheriff's Office who testified regarding an evading arrest incident involving appellant. Deputy Pool testified that after observing a motorcycle traveling at 105 miles per hour in a 65 mile per hour speed zone, he attempted to conduct a traffic stop on the motorcycle. Deputy Pool activated his lights and sirens and caught up to the motorcycle. The driver of the motorcycle, later identified as appellant, looked over his shoulder toward Deputy Pool, changed lanes, and increased his speed to over 133 miles per hour. The motorcycle exited the expressway, continued down the road at a high rate of speed, running red lights along the way. The driver of the motorcycle also turned off his headlight. The pursuit continued out of Harris County into Galveston County, where agencies had been notified by Deputy Pool of the ongoing situation. Deputy Pool testified that, in his experience, the driver's maneuvers were indicative of evading the police. Ultimately, the driver was stopped and identified as appellant. At the time of the stop, he did not have any warrants; however, his license was suspended. Appellant was "cooperative" and, according to

6

Deputy Pool, stated that he did not notice that Deputy Pool was attempting to pull him over and that his maneuvers were how he typically operates his motorcycle. Appellant was arrested for evading detention on a motor vehicle.

Corporal Trevor Powell with the Galveston County Sheriff's Office testified regarding identification of fingerprints. Corporal Powell fingerprinted appellant and rendered an opinion that appellant's fingerprints were identified in at least five other judgments including state jail felonies, each of which also contained the same unique Texas identification number assigned to appellant.

Appellant called Danielle Jones, a close friend, to testify. Jones testified that she has known appellant for approximately ten years. In the time she's known him, she testified that appellant has worked hard and is a "very good father." She stated that she found the charges against him were "very out of character" as he is usually "calm, caring, [and] not aggressive at all." While she stated she was aware he had a criminal history, the details and extent of it were unknown to her.

Appellant testified on his own behalf. He explained that he was not evading arrest with his motorcycle as testified to by Deputy Pool, but that he was just driving how he normally does in that area. He stated that he would have stopped immediately if he had seen the officer. As to the incident involving Clark, he testified that he and Clark had been dating at the time. He did not intend to fire at Clark, he was firing at her vehicle's tire. He explained that he learned a lot from the situation and has regrets about what happened. He requested a short sentence and explained that he would do better with his life when released. On cross-examination, appellant admitted to prior charges, convictions, and jail

time. He also admitted to having had his probation revoked in the past. He did not deny his part in shooting Clark's vehicle. Testimony was also elicited regarding pending charges involving a robbery.

On June 11, 2020, the trial court sentenced appellant to twenty years' confinement on the charge of aggravated assault with a deadly weapon and ten years for the charge of felon in possession of a firearm, to run concurrently. On July 13, 2020, appellant filed a motion for new trial, seeking a new trial on both charges and a new punishment trial as well. The trial court, in its ruling on September 3, 2020, granted appellant's motion as to punishment on the aggravated assault with a deadly weapon charge and denied the remainder of the motion. This appeal followed.

## II. JURISDICTION

By his first issue, appellant argues that this Court does not have jurisdiction over this matter because the trial court granted his motion for new trial in part, voiding his original sentence and thus, the judgment is not final. He argues that this Court should abate the proceeding, allow for the trial court to conduct a new punishment trial on the aggravated assault with a deadly weapon charge, and subsequently reinstate the appeal to address the remaining issues in the appeal. The State, in response, contends that the trial court's ruling on the motion for new trial was untimely and therefore the motion for new trial was denied by operation of law.

On appellant's motion, we abated this cause and remanded to the trial court for findings of fact and conclusions of law regarding the timeliness of its ruling in light of the emergency orders issued by the Texas Supreme Court, which allows suspension and

8

modification of certain deadlines because of the COVID-19 pandemic. The trial court held a hearing and subsequently issued findings of fact and conclusions of law stating that its ruling on appellant's motion for new trial was timely pursuant to the Texas Supreme Court's Eighteenth COVID-19 emergency order allowing the trial court to "modify or suspend any and all deadlines and procedures . . . ." *Eighteenth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 122, 122–23 (Tex. 2020).

A trial court generally retains plenary power over a criminal prosecution for thirty days after imposing or suspending a sentence in open court. *See* TEX. R. APP. P. 21.3, 21.4(a); *State v. Davis*, 349 S.W.3d 535, 537 (Tex. Crim. App. 2011). During these thirty days, a criminal defendant may file a motion for new trial. TEX. R. APP. P. 21.3, 21.4(a); *Davis*, 349 S.W.3d at 537. The filing of a timely motion for new trial extends the trial court's plenary power up to seventy-five days after the trial court imposes a sentence. TEX. R. APP. P. 21.8(a); *Ex parte Matthews*, 452 S.W.3d 8, 13 (Tex. App.—San Antonio 2014, no pet.). The trial court must rule on the motion for new trial within seventy-five days of the sentence date or the motion will be deemed denied by operation of law upon expiration of the seventy-five-day period. TEX. R. APP. P. 21.8(a), (c); *Montelongo v. State*, 623 S.W.3d 819, 823 (Tex. Crim. App. 2021) ("Obviously, a motion for new trial is overruled when the trial court enters an order overruling the motion" but "a motion for new trial can also be overruled by operation of law without any action on the trial court's part"). "[O]nce a motion for new trial is overruled by operation of law, the trial court loses jurisdiction to rule upon it." *Montelongo*, 623 S.W.3d at 823 (quoting *State v. Moore*, 225 S.W.3d 556, 566–67 (Tex. Crim. App. 2007)). An order entered by a trial court without jurisdiction to

9

do so is void. *See Ex parte Alexander*, 685 S.W.2d 57, 60 (Tex. Crim. App. 1985) (concluding only the Texas Court of Criminal Appeals had authority to grant relief requested by defendant in habeas proceeding and trial court's order granting such relief was void and should be set aside).

The trial court imposed appellant's sentence on June 11, 2020. Pursuant to Rule of Appellate Procedure 21.4(a), appellant had to file his motion for new trial within thirty days after the trial court imposed his sentence, or by July 13, 2020. *See* TEX. R. APP. P. 21.4(a). Appellant timely filed a motion for new trial on July 13, 2020, thereby extending the trial court's plenary power until August 25, 2020—seventy-five days after the date the trial court imposed the sentence. *See* TEX. R. APP. P. 21.8(a).

The trial court held a hearing on appellant's motion for new trial on August 4, 2020. On September 3, 2020, the trial court ruled on appellant's motion, granting it in part and denying it in part. In its ruling, the trial court did not mention the Texas Supreme Court's Eighteenth Emergency Order Regarding the COVID-19 State of Disaster to extend the time to rule on appellant's motion for new trial beyond the seventy-five-day deadline.

In *In re State ex rel. Ogg*, the Texas Court of Criminal Appeals addressed whether an identical provision in an earlier emergency order authorizes trial courts to extend jurisdictional deadlines. 618 S.W.3d 361 (Tex. Crim. App. 2021) (orig. proceeding). The Court held neither the provision in the emergency orders nor Texas Government Code § 22.0035(b)—which authorizes the Texas Supreme Court to "modify or suspend procedures for the conduct of any court proceeding affected by a disaster during the pendency of a disaster declared by the governor"—authorizes trial courts to modify

10

substantive rights because the provision refers only to procedural matters. *Id.* at 364. The Court explained:

> This language giving a court the power to modify or suspend "deadlines and procedures" presupposes a pre-existing power or authority over the case or the proceedings. A court may extend a deadline or alter a procedure that would otherwise be part of the court proceedings. It does not suggest that a court can create jurisdiction for itself where the jurisdiction would otherwise be absent or that a judge could create authority to preside over proceedings over which the judge would otherwise be barred from presiding . . . .
>
> . . . .
>
> If the Supreme Court's Emergency Order were really intended to permit trial courts to enlarge their own jurisdiction and to permit trial judges to enlarge the types of proceedings over which they have authority, we would expect a provision to explicitly say so.

*Id.* at 364–65.

The deadline to rule on a motion for new trial is not procedural in nature—it is jurisdictional and, after it expires, the trial court loses authority to act in the case. *See Montelongo*, 623 S.W.3d at 823. By ruling on appellant's motion for new trial on September 3, and subsequently stating it rendered its order pursuant to the Supreme Court's emergency orders, the trial court impermissibly sought to "create jurisdiction for itself where the jurisdiction would otherwise be absent." *Ogg*, 618 S.W.3d at 364. The trial court's plenary power expired on August 25, 2020. The trial court thus lacked subject matter jurisdiction to enter its September 3, 2020 order granting in part and denying in part appellant's motion for new trial. *See id.*; *State v. Temple*, 622 S.W.3d 592, 595 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (finding that the Texas Supreme Court's emergency orders related to the COVID-19 pandemic do not allow a court to create

11

jurisdiction for itself when jurisdiction would otherwise be absent); *see also Flores v. State*, No. 01-20-00213-CR, 2022 WL 961554, at *9–11 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, no pet. h.) (mem. op., not designated for publication) (same).

Because the trial court did not rule on appellant's motion for new trial within the prescribed seventy-five day period, the motion was overruled by operation of law on August 25, 2020. *See* TEX. R. APP. P. 21.8(a), (c). We limit review of appellant's points of error to the record before us through August 25, 2020, the date on which the trial court's jurisdiction expired. Appellant's first issue is overruled.

### III.   SUFFICIENCY OF THE EVIDENCE

By his second issue, appellant argues that the evidence was insufficient as it related to his aggravated assault with a deadly weapon conviction. Specifically, he contends that the evidence was insufficient to prove he "threatened Clark with 'imminent bodily injury.'"

### A.   Standard of Review & Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence "in the light most favorable to the verdict" to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in

12

establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Under the Texas Penal Code, a person commits the offense of assault if he "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE ANN. § 22.01(a)(2). The offense becomes an aggravated assault if that person "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2). The indictment charged that appellant intentionally and knowingly

13

threatened Clark with imminent bodily injury and that appellant used and/or exhibited a gun.

## B. Analysis

The State, in order to prove an assault by threat, must prove beyond a reasonable doubt that appellant intentionally or knowingly threatened another with imminent bodily injury. *Id.* § 22.01(a)(2). A variant of "aggravated assault—assault while using a deadly weapon—is a 'nature of the conduct offense.'" *Hall v. State*, 145 S.W.3d 754, 758 (Tex. App.—Texarkana 2004, no pet.) (quoting *Guzman v. State*, 988 S.W.2d 884, 887 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.)). A person acts intentionally with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. TEX. PENAL CODE ANN. § 6.03. A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* "[A] jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct" of the defendant. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)). "[T]here must be some evidence of a threat being made to sustain a conviction of assault by threat." *Olivas v. State*, 203 S.W.3d 341, 349 (Tex. Crim. App. 2006). The crucial inquiry is "whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Id.* at 347. "Imminent" has been defined as meaning "near at hand." *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989). An event is "near at hand" when it is on the verge of happening. *Hill v. State*, 844 S.W.2d

14

937, 938 (Tex. App.—Eastland 1992, no pet.).

Appellant argues that because he did not directly point the gun at Clark, he did not threaten her. The statute does not require actual perception of the threat by the victim and appellant cites no authority establishing that the victim must perceive the threat. *See* TEX. PENAL CODE ANN. § 22.01(a)(2). While Clark did not testify at the trial, two eyewitnesses did, Nash and King. As previously discussed, King testified that appellant was angry, using foul language, and generally confrontational during the incident. In contrast, Nash testified that appellant seemed calm, but did not dispute that he exhibited a gun and shot several times into Clark's vehicle. The police who responded to the scene testified that Clark appeared "visibly distraught," "upset," "nervous," and "real timid" after the incident. The jury heard evidence that there was an argument between appellant and Clark, that appellant's vehicle was stopped behind Clark's, preventing her from leaving, and that appellant, while standing near Clark, used a gun to shoot her vehicle several times before leaving the scene.

Appellant also argues that there was no evidence of a verbal threat or that "he articulated any threat of personal injury." However, the State did not need to prove he "articulated" a specific threat of injury; rather, it needed only to establish that appellant "acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Olivas*, 203 S.W.3d at 347. Here, the jury could have reasonably inferred that appellant intentionally or knowingly threatened Clark by exhibiting a gun and shooting it at Clark's vehicle from close range with bystanders nearby, coupled with the testimony that appellant was angry and confrontational.

15

In our sufficiency review, we may not re-evaluate the weight and credibility of the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We must defer to the jury's resolution of conflicting evidence in the State's favor. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Accordingly, we find the evidence was sufficient for the jury to determine appellant "acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Olivas*, 203 S.W.3d at 347. We overrule appellant's second issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

By his final issue, appellant argues that he received ineffective assistance of counsel at the punishment stage of his trial.

### A. Standard of Review & Applicable Law

To prevail on an ineffective assistance claim, appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142. To satisfy the first prong, appellant must prove by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. *Id.*

16

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if appellant rebuts the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142. "In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Lopez*, 343 S.W.3d at 142; *see Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("Any allegation of ineffectiveness must be firmly founded in the record . . . ."). "It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). When direct evidence is unavailable, we will assume counsel had a strategy "if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143. "In making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Id.*

## B.    Counsel's Performance

The proper measure of the first prong, counsel's performance, is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The guarantees of the Sixth Amendment rely on the legal profession's maintenance of professional norms. *Id.* Although no set of rules can satisfactorily take account of the multitude of circumstances and choices counsel should make when representing a criminal defendant, representing a defendant entails certain basic duties like counsel demonstrating such skill and

knowledge as will render the trial a reliable adversarial process. *Id.* at 687. Although important, the purpose of the effective assistance guarantee under the Sixth Amendment is not to improve the quality of representation, but rather to ensure that criminal defendants receive a fair trial. *Id.* at 689.

Even if professionally unreasonable, an error does not warrant setting aside the judgment if there has been no prejudicial effect on the outcome. *United States v. Morrison*, 449 U.S. 361, 364–65 (1981). The test for prejudice requires the defendant to show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694.

Appellant alleges that his trial counsel failed to conduct a thorough presentencing investigation, which in turn caused counsel's failure to present certain mitigation evidence at the punishment phase of appellant's trial. Specifically, appellant focuses on his counsel's alleged failure to investigate his mental health issues, namely post-traumatic stress disorder (PTSD). Appellant notes that his self-report of PTSD was within the trial court's presentencing investigation report, which was received by counsel the morning the punishment phase of appellant's trial began. Appellant suggests that his counsel failed to investigate his PTSD or request a continuance after receiving the report from the trial court in order to more thoroughly analyze the report.

Any alleged failure to present mitigating evidence or a witness in the punishment phase is irrelevant absent a showing that any such evidence or witness was available and that the defense would have benefitted from the evidence. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007).

Appellant raised ineffective assistance of counsel in his motion for new trial and a hearing was held, which includes testimony from appellant's trial counsel. Trial counsel agreed it would have been beneficial to have information related to a "stressful event" encountered by appellant which may have caused his PTSD. She agreed that mitigating evidence could include things such as "frontal lobe damage" and that it would have been "useful" for her to have any information regarding any injuries appellant suffered in the past. She explained, however, that she met with appellant numerous times over the course of her two-year representation of appellant, and that he did not disclose or "open up" regarding any stressful events, including the loss of one of his children. Appellant's trial counsel further explained that she did not have a private investigator or social worker assist in this case. She did, however, meet with various witnesses and discuss additional potential witnesses with appellant. Furthermore, while appellant mentioned several incidents in his motion for new trial that could have contributed to his report of PTSD, he did not disclose these incidents to his counsel. She testified that she was unaware of the incidents until she read appellant's motion for new trial. Appellant's trial counsel further testified that she had discussions with appellant regarding what he wanted to present for the entirety of his trial, including the punishment phase of the trial.

While appellant contends there was more that his counsel should have presented, specifically related to his PTSD and potential traumas, he does not dispute that his counsel did present mitigating evidence at his punishment hearing, including evidence of good character. Appellant's trial counsel testified that she did perform a thorough investigation, met with appellant numerous times, and spoke to witnesses. *See Wiggins*

*v. Smith*, 539 U.S. 510, 521–22 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (quoting *Strickland*, 466 U.S. at 690–91)). Appellant was the only one to testify regarding the traumatic events he believes caused his PTSD and he was the only one to provide information regarding any head injuries he may have suffered in the past. Based on the record before us, it appears that the only person who could have testified about any of the events he raised in his motion for new trial would have been appellant himself. Thus, the failure to present evidence of the alleged incidents is borne primarily by appellant, as he had ample opportunity to divulge this evidence to his trial counsel. *See Ex parte Martinez*, 195 S.W.3d 713, 728 (Tex. Crim. App. 2006).

Accordingly, because we cannot conclude that his counsel's conduct fell so outside the bounds of reasonable professional assistance that appellant was deprived of a fair trial, we overrule his ineffective-assistance claim. *Strickland*, 466 U.S. at 687–89. Appellant's third issue is overruled.

## V.    CONCLUSION

The judgments of the trial court are affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
30th day of June, 2022.

20